Slocum *agt.* Closson and Mosher.

---

SLOCUM, appellant, *agt.* CLOSSON & MOSHER, respondents.

### Questions discussed.

1. Whether, on a bill by Slocum for the *specific performance* of a written agreement, under seal, to convey a farm of land by Closson, one of the respondents, to him, there was proof of a prior valid contract between Closson and Mosher, to sell the farm to Mosher? Or, whether the latter contract amounted to any thing more than a *negotiation*—a *proposal* for a sale merely?

2. Whether the written agreement to Slocum was obtained from Closson by unfair and deceptive representations, and with a knowledge, and in violation of a previous parol agreement or understanding, between Closson and Mosher, that Mosher was to have the farm?

3. Whether Mosher, having purchased and taken a deed of the premises of Closson, with knowledge of the previous agreement between Slocum and Closson, was affected by that knowledge, so that his deed should be set aside, or he compelled to join with Closson in the specific performance?

ON the 9th of September, 1833, Joseph Slocum, the appellant, filed his bill of complaint in the court of chancery, before the chancellor, against Isaac Closson and Joseph P. Mosher,

45

the respondents, for the specific performance of an agreement alleged to have been made by said Isaac Closson with said Joseph Slocum.

The agreement, as set out in the bill, was dated the 11th June, 1833, made between Isaac Closson, of Schaghticoke, of the first part, and Joseph Slocum, of the village of Syracuse, of the second part; for the consideration of one hundred dollars, Closson contracted, and agreed to sell to Slocum, the equal undivided half part of a farm, situated in the town of Schaghticoke, county of Rensselaer, of which Robert Closson died seized, (giving the boundaries,) containing about two hundred and fifty acres.

The said Closson agreed to execute and deliver to the said Slocum a warranty deed for said land, upon condition that Slocum, his heirs, or assigns, paid to the said Closson, his heirs, or assigns, for the same, the sum of thirty dollars for each acre, in one half of said farm, which was to be surveyed. It being then supposed that said farm contained two hundred and fifty acres, the half of which would be $3,750, of which $100 was paid in hand, and the remaining $3,650 to be increased or diminished, as the half of said farm should overrun or fall short of one hundred and twenty-five acres, to be paid by the 1st September next. The said Slocum, for himself, his heirs, executors and administrators, covenanted and agreed to and with said Closson, his heirs, and assigns, that said Slocum would pay the said several sums as they became due, without any deduction of taxes or assessments whatever. And it was further agreed, that if default be made in fulfilling the agreement, or any part thereof, on the part of said Slocum, then said Closson, his heirs and assigns, should be at liberty to consider the contract as forfeited and annulled, and to dispose of the said land to any other person, in the same manner as if the contract had never been made. (Signed, ISAAC CLOSSON, L.S.)

The bill alleged, that a counterpart of the agreement was signed and sealed by Joseph Slocum, and delivered to said Closson. Also that said Slocum, at the time of executing said agreement, paid to said Closson the sum of one hundred dol-

Slocum *agt.* Closson and Mosher.

lars, as a part of the consideration to be given as aforesaid. That Slocum, in expectation that a deed would be executed to him by said Closson of said premises, pursuant to the terms of the agreement, went from Syracuse to Schaghticoke in the latter part of the month of August, and notified said Closson that he was prepared and desirous to pay the said purchase money for said land, and to receive a conveyance thereof. That on or about the 27th of August, Slocum requested said Closson, in writing, that he would cause an accurate survey of said premises to be made, or that he would unite with the agent of Slocum in employing a surveyor, and other necessary assistants, to make the survey; and informing said Closson, in case he should decline to comply with said request, he, Slocum, would cause such survey to be made. That Closson, on receiving such communication, stated, in substance, that Slocum could go on and make the survey; that it was not necessary for him to attend. Thereupon the agent of Slocum, on the 30th August, 1833, caused such survey to be made by an experienced surveyor; on which survey it was ascertained that said farm contained two hundred and fifty acres only. That Slocum, on the 31st August, caused a deed of said premises to be made out in pursuance of the agreement, and went in search of said Closson, with said deed, and with the purchase money, for the purpose of paying said Closson, and obtaining the execution of said deed. That Closson designedly avoided said Slocum, and attempted to prevent an interview with said Slocum, by passing from place to place, and shut himself up for a time, with the design of preventing said Slocum from tendering him the purchase money, and obtaining the execution of said deed. That Slocum pursued said Closson to the town of Stillwater, and there found him, apparently attempting to conceal himself from said Slocum; and when discovered, said Closson at first refused to suffer said Slocum to enter the house where he was; that then, on the 31st of August, 1833, said Slocum, having with him upwards of $4,000, offered to pay said Closson the said purchase money of the said farm, in pursuance of the terms of the aforesaid agreement; and informed said Closson that the

money was then there ready for him to receive, and that said Slocum was desirous to pay it to him, and receive the conveyance of said land. That said Slocum then informed Closson that he had there a conveyance, drawn conformable to the terms of the said agreement, for said Closson to execute, and requested him to execute the conveyance on receiving the purchase money. That, during said conversation, said Closson stated that there was more land in said farm than appeared in the survey made for said Slocum ; that thereupon said Slocum offered to pay him for all the land so contracted to be sold, whatever the true quantity should be, and to receive a conveyance of the whole of said Closson's share.

That said Closson wholly declined, and refused to receive said purchase money, or to execute such conveyance, and left said Slocum, apparently attempting to elude the offer of said Slocum. Afterwards, on the 2d September, 1833, said Slocum, by his agent, again attempted to induce said Closson to receive said purchase money, and execute such conveyance, but said Closson could not be found.

The bill charges that said Closson still wholly refused to receive said purchase money, and to execute said deed.

The bill further charged, that on or about the 2d September, 1833, said Closson executed a conveyance of said premises to Joseph P. Mosher, which was recorded on the 3d September, which conveyance was wholly unknown to said Slocum at the time of filing his bill of complaint. Charges that said deed to Mosher was executed and recorded in fraud of said Slocum's rights, and was obtained and received by said Mosher with an intent to defraud said Slocum. That at the time the deed was so executed, the said Mosher, who was the brother-in-law of said Closson, well knew of said bargain and sale to said Slocum, and the payment made on said contract, and of the offer made as aforesaid by said Slocum, to pay the residue of the purchase money, and to receive a deed, in pursuance of his contract with said Closson.

The defendants answered, without oath, and admitted the seizure of said premises by said Closson, in and before the

month of June, 1833. Admitted the execution of the agreement by Closson to Slocum of said premises, as stated in the bill. But alleged that the same was so signed, by the said Closson, by the fraudulent procurement, and false and fraudulent representations of said Slocum. That long before the execution of such agreement, to wit: in or about the year 1828, the said Joseph P. Mosher had applied to Closson to purchase his, said Closson's, share of said farm; that Closson then agreed, or promised, to sell the same to him, but no price was then agreed upon between them, and Closson soon after left the state of New-York for St. Louis.

That while he, Closson, remained in that region of country, and between the years 1828 and 1833 inclusive, said Mosher, in the expectation and belief that he was to purchase and have the interest or share of said defendant, Closson, in said farm; and at the request of said Closson, sent him, from time to time, various sums of money, amounting in the whole to $500. That in or about the month of March, 1833, Mosher, being desirous to close up the business, and get a conveyance from said Closson, having previously written several times, again wrote to said Closson, enclosing him $200, and requesting him, without delay, to set his price upon said farm, that the business might be closed. In answer to which, Closson wrote, about the 25th March, 1833, agreeing to take thirty dollars per acre for his share or interest in said farm. That immediately thereafter Mosher wrote to said Closson, accepting said proposition; and also procured a deed of said premises to be prepared for Closson to execute; and caused the same to be sent by mail to Closson, at the same time requesting him to execute the deed and return it to said Mosher, by mail, agreeing to send Closson the residue of the purchase money in a draft, by mail, or to pay, or secure the payment thereof, in such other manner as Closson should direct.

That said last mentioned letters, and said deed, were received by Closson, by due course of mail; and that Closson would have immediately executed said deed, and returned the same by mail, but having made his arrangements for leaving St. Louis

and returning to the state of New-York, on a visit to said Mosher, concluded to delay the execution of said deed until he arrived at the residence of said Mosher, in Easton, in the state of New-York.

That while said Closson was on his way to said Mosher's, with the intention of executing said deed on his arrival, and having the same in his possession with that intent and purpose, he, Closson, met with said Slocum, and one Wm. B. Slocum, his father, at the village of Syracuse, in the county of Onondaga, N. Y., at which place said Wm. B. Slocum, who pretended to act as an agent for his sons, said Joseph Slocum and one Hiram Slocum, or one of them, but who, as he alleged, was acting for his own benefit and interest, as well as in behalf of his sons, commenced a conversation with said Closson in relation to the purchase by the said sons, or one of them, of the share or interest of said Closson in said farm; that Closson then told both the complainant and Wm. B. Slocum, that he had agreed to sell his share of said farm to Joseph P. Mosher, and that said Mosher had sent him a deed thereof to be executed, which he had with him, and intended to execute it when he arrived at the residence of said Mosher; that both the complainant and said Wm. B. Slocum then averred, and stated to and assured said Closson, that said Mosher did not wish, and did not intend to purchase said Closson's interest in said farm; that said Mosher intended to, and was about to sell his interest in said farm to the said Hiram Slocum; and that said Mosher had suffered the farm, and fences thereon, to remain and be in a ruinous state, for the want of proper and necessary care and husbandry; and urging said Closson, as he and the said Joseph and Hiram Slocum were old friends and school-mates, to sell the same to them. That in consequence of such representations the said Closson, supposing the same to be true—as the said Wm. B. Slocum represented that he had then, within a few days, seen the said Joseph P. Mosher—was induced to receive the said one hundred dollars, and to sign the said agreement, which complainant alleged was for the benefit of Hiram Slocum, or for Hiram and himself.    But defendants alleged and·

averred that said contract was also, in part, for the benefit of said Wm. B. Slocum.

The answer alleged that said Joseph, Wm. B., and Hiram Slocum, well knew that said Mosher was the owner of the one equal undivided half part of said farm, as tenant in common with said Closson, and had contracted with said Closson for the purchase of his interest.

The defendant, Mosher, alleged that one of the means made use of by said complainant and Wm. B. Slocum, to procure and obtain said contract or agreement from said Closson, was by getting him intoxicated with ardent spirits.

Denied that complainant ever notified Closson that he was prepared and desirous to pay him the purchase money for said premises, and to receive a conveyance therefor; or ever tendered or offered to pay the same; or ever tendered a deed, to be executed by Closson, as alleged.

Denied that complainant, in writing or otherwise, ever requested Closson to have the farm surveyed, as alleged in the bill of complaint; or that complainant ever caused an accurate survey of the same to be made.

Admitted said Closson had refused, and still did refuse, to convey his interest in said farm to complainant, for the reasons before stated in the answer. That Closson, as soon as he discovered the fraud practised upon him, offered to pay back the said one hundred dollars, with interest, which offer was refused by complainant.

Admitted, that on or about the 2d September, 1833, Closson conveyed his interest in said premises to Mosher, and that the deed was recorded on or about the 3d September, 1833. But alleged that such conveyance was in pursuance of the aforesaid agreement, made between said Closson and said Mosher, which agreement was well known to the complainant.

The foregoing contains, in substance, the bill and answer in the cause. The cause being at issue upon a general replication put in by the complainant, an order was, on the 18th May, 1834, entered, requiring the respective parties to produce witnesses.

[It is impossible to do justice to this case without giving the evidence almost entire, as the decision of the cause necessarily rests upon the construction and weight of such evidence.]

The complainant introduced witnesses, and the depositions were taken as follows :—

On this 26th of May, 1836, personally appeared before me, John J. Hill, an examiner in chancery, *John Wilkinson,* a witness produced on the part of the complainant, who, being duly affirmed and orally examined by the counsel for said complainant, says,—that he resides at Syracuse, in the county of Onondaga, and is thirty-seven years of age : I am acquainted with the complainant in this cause, and am partially acquainted with Isaac Closson, one of the defendants ; but I do not know Joseph P. Mosher, the other of said defendants. On or about the 11th day of June, 1833, I saw Mr. Joseph Slocum, the complainant, and the said Isaac Closson. They came to my office in Syracuse, for the purpose of having an instrument drawn, by which Mr. Closson was to convey a farm in Rensselaer county to Mr. Slocum. I drew the instrument marked as Exhibit I, which the said Closson executed, and delivered to Mr. Slocum, and to which I signed my name as the subscribing witness. There was a counterpart of the same instrument, made at the same time, and delivered to Mr. Closson, which said counterpart was executed by Mr. Slocum, the complainant.

If I remember right, he, the said Isaac Closson, was then on his return from Missouri, where he had been for some time previous, and I think as long as three years previous, as he stated to me. I talked to him a good deal at length about the western country, particularly about that part of Missouri where he had been residing. He told me a great deal about it, and that he was going to return to Missouri. This conversation was had with Mr. Closson while he was in my office, waiting for the papers to be prepared. I do not remember that any other person was in company with Mr. Isaac Closson than Mr. Slocum. He, Mr. Closson, talked more about the bargain than Mr. Slocum, and gave more directions about drawing the pa-

pers than Mr. Slocum. It was towards night when Mr. Closson and Mr. Slocum came to my office, and the writings were executed before they left. I did not discover that Mr. Closson, at this time, was at all affected with liquor, and I think the conversation I had with him, concerning his travels in the west, &c., was such, that if he had been at all affected by liquor, I should have been able to discover it. I took a considerable interest in the conversation.

The said witness, on being *cross-examined* by the counsel for the defendants, says,—I first became acquainted with the complainant about the year 1824. I think Mr. Slocum paid me for drawing the instruments; whether he paid me at the time, or afterwards, I am not certain; but I think I charged the same to Mr. Slocum. I never saw Mr. Closson before the time he came to my office, to my knowledge, nor have I seen him since.

*Ephraim Congdon*, being sworn, says,—that he resides in the town of Schaghticoke, in the county of Rensselaer, and is acquainted both with the complainant, and Isaac Closson and Joseph P. Mosher, the defendants in the above suit, and has known them for some years past; that in March, in the year one thousand eight hundred and thirty-two, he, the witness, applied to Joseph P. Mosher for some money, through another person; that on the twenty-seventh day of March, in the year one thousand eight hundred and thirty-two, he received of said Mosher the money applied for, and gave him his, the witness's, note for the same; that when said Mosher counted out said money to him, the witness, he remarked that a part of that money had been sent, by mail, either to St. Louis, in Missouri, or to some of the villages in the vicinity of St. Louis; that he had forwarded it there, directed to Isaac Closson; that the said money had been returned to Mr. Mosher; that when the money was put into the post-office by Mosher, said Closson was west of Missouri, on a hunting expedition, and when Closson returned, the postmaster refused to deliver it to him, supposing that he, Closson, was not the man to whom it was sent, and thereupon the said postmaster returned the same money to said Mosher; the amount so returned was two hundred dollars, as

he believes; the money was in two one hundred dollar bills; that he, the witness, did not learn from the said Mosher on what account the said money was so sent to said Closson. That the amount of the money which he, the witness, received of said Mosher, was five hundred dollars; that the person through whom he applied for said money was Stephen Batty, of Easton.

*William M. Dennis*, being sworn, says,—that he resides in the town of Lansingburgh, in the county of Rensselaer, and is acquainted with the complainant, Joseph Slocum, and the defendants, Isaac Closson and Joseph P. Mosher, the defendants in the above suit; that in the month of June, in the year one thousand eight hundred and thirty-three, Isaac Closson, one of the above defendants, called on him, the witness, at his store in Lansingburgh, and stated that he was then on his return from the Rocky Mountains, or St. Louis, or some place at the west; that said Isaac had then with him a gun and a gold watch, which appeared to be new; that he, the witness, then asked him, the said Isaac, how he got funds to buy those articles, and whether he had received any money from Mr. Mosher. Said Isaac then stated to him, the witness, that he had sold his farm to Joseph Slocum of Syracuse, and that said Joseph Slocum had advanced him some money upon it; the amount mentioned he, the witness, does not now recollect. He, the witness, asked him what he got for his farm; and he, the said Isaac, replied, that he got thirty dollars an acre for it. Whereupon he, the witness, remarked to him, that he had sold the farm for less than what it was worth; and said Isaac then told him, that was all he expected to get for it, and all he asked for it; and that he sold it to the first man who offered him his price for it. Witness then asked him if he had entered into writings for the sale of the farm; to which said Closson replied that he had, and that he was to have the cash for the farm on the first day of September, then next ensuing. He, the witness, asked said Isaac why he did not sell the farm to Mr. Mosher; to which the said Isaac replied, that said Mosher wished to purchase it for a less price. The witness thinks that said Isaac stated, that Mr. Mosher wished to buy it for twenty-

eight dollars for the acre, or had offered him that for it. That at the time of this conversation he, the witness, understood from the said Isaac, that he was then on his way home from the west, and had not then been to Schaghticoke since his return from the west.

*William M. Dennis,* being *cross-examined* by the counsel for the defendants, says,—that the said Isaac Closson appeared to be addicted to the free use of ardent spirits before he left Schaghticoke and went to the westward; that on his return he, the witness, thought, from his appearance, that the habit of indulging in the free use of spirituous liquors had grown upon him while he was absent at the west, which was five or six years, as he thinks; that it was about one or two o'clock in the afternoon when the said Isaac Closson called on him, the witness, as stated in his testimony on his direct examination, and that said Isaac appeared then to have been drinking spirituous liquors, and appeared to be under the influence of liquor in some degree, but still was so that he could converse freely, and walk without staggering; that he, the witness, was with said Isaac on that day an hour or two, and saw him, during the time he was in his company, drink spirituous liquors two or three times. That in the interview he, the witness, had with said Isaac, as before stated, he, the said Isaac, appeared to be irritated towards Mr. Mosher, and used much harsh language against him; that when witness asked him why he had not sold the farm to Mosher, rather than to a stranger, said Isaac replied that Mosher had not sent him funds as he ought to have done, although he had repeatedly written to him for them, and he supposed that Mosher thought that he would never return; and that Mosher wanted to get the farm for a less price than it was worth, and that he never should have it; that there was money coming to him, the said Isaac, for the rent of the farm; but he, the witness, did not understand from the said Closson from whom said rent was coming; that he, the witness, had an impression upon his mind that he once knew of Mr. Mosher inclosing and sending money to the said Closson, per mail, while he was at the west, but as to this he is not positive; that in

this conversation, said Closson stated that a deed for convey-ing the farm to him, the said Mosher, had been sent to him, for him to execute, but he said that the deed was filled up for a less sum than his price, or less than what he thought the farm was worth, and therefore he declined to execute it; that he don't recollect that said Isaac mentioned who the deed was filled up by, or who sent it to him; that he received it a short time before he started to come home; that the witness under-stood from said Closson that he made the bargain for the sale of the farm to said Slocum, at Syracuse, on his way home; that witness believes that said Closson stated that he saw Wil-liam Slocum at Syracuse, on his way home, and that he also saw Mr. Fish there, with whom he was acquainted; that he don't recollect that said Closson stated any of the particulars of his said bargain made in Syracuse, further than he, the wit-ness, has already stated.

*William M. Dennis,* being further examined by the counsel for the complainant, says,—that it is his impression, that in the conversation he had with said Isaac, as before stated, he un-derstood from said Closson that there was money coming to him for the rent of the farm, which he expected to have re-ceived through Mr. Mosher; and it is his impression that he then understood, from said conversation, that it was the money coming to him for the rent of the farm of which he complained that Mosher had not sent him; that he,,the witness, felt inter-ested for Mr. Mosher, which was the reason of his having so particular conversation with said Closson in relation to his sale of the farm.

*Gerrit Fort,* being sworn, says,—that he resides in the town of Cambridge, in the county of Washington, and is acquainted with Joseph Slocum, the complainant, and Isaac Closson and Joseph P. Mosher, the defendants in the above suit; that some time in the month of July, in the year one thousand eight hun-dred and thirty-three, about three or four weeks after Mr. Clos-son returned from the west, Hiram Slocum, Isaac Closson, and Joseph P. Mosher came to his house in Schaghticoke, where he then lived, and had a conversation relative to the sale of the

farm of Isaac Closson to Joseph Slocum. They came there in the fore part of the day, remained there more than an hour, and left his house before eleven o'clock in the forenoon. He does not recollect that anything particular was said about the manner in which the bargain was made between said Closson and said Joseph Slocum for the purchase of said farm; but Mr. Closson stated that it was a fair and honorable transaction on the part of said Joseph Slocum. This he stated in the presence and hearing of said Mosher. That as far as he, the witness, discovered, said Closson was then perfectly sober. That he, the witness, during several weeks immediately after said Closson returned from the west, frequently saw said Closson, and that he always, during that time, with the exception of twice, appeared to him, the witness, to be perfectly free from the influence of spirituous liquors. That he does not recollect that there was anything, during the conversation, said of any unfairness on the part of said Joseph Slocum, in relation to the making of the bargain for the sale of said farm to him. There was something said about the situation of the farm, and said Closson said that he wished Mr. Mosher to have the farm. That Mr. Hiram Slocum, whether voluntarily or on the request of some one present, he, the witness, does not recollect, stated that he would write to his brother, Joseph Slocum, and request him to relinquish his bargain for said farm, and that he presumed he would do it on receiving back the hundred dollars which he had paid Closson, and receiving a small compensation, say about fifteen or twenty dollars, for his trouble.

*Gerrit Fort*, being *cross-examined* by the counsel for the defendants, says,—that at the time of the conversation mentioned in his testimony on his direct examination, he resided about half a mile from the residence of Hiram Slocum, and a little over three miles from the residence of Joseph P. Mosher; that he thinks the said Isaac Closson, Joseph P. Mosher, and Hiram Slocum, did not, at that time, come to his house together, and he thinks that Isaac Closson and Joseph P. Mosher came first, but of this he is not certain; that soon after said Closson and Mosher came, if they came first, Hiram Slocum came; that the

conversation which he has stated in his testimony on his direct examination, took place when they all three of them were there together. That he does not know that said Hiram then showed a letter from his brother Joseph Slocum; that he, the witness, had seen a letter before that time, which said Joseph Slocum had written to said Hiram, and heard the said Hiram read the same, or a part of it, but does not recollect that said Hiram showed said letter at the time of said conversation.

*Question.* Did the said Joseph, in that letter, authorize him, the said Hiram, to make any adjustment or arrangement in relation to said farm?

The counsel for the complainant objects to the witness answering any inquiries relative to the contents of said letter, without producing; it and the testimony on that subject is taken, subject to that objection.

The witness says,—that in said letter Joseph Slocum wrote to his brother Hiram, leaving it optional with said Hiram, either to hold on to the contract or relinquish it, just as he saw fit. That at the time of the above conversation, he understood that said Closson, Mosher, and Hiram Slocum had agreed to meet and make an adjustment relative to said farm, and have no difficulty about it, and that they met at his house for that purpose. That he, the witness, understood that before they left his house they, the said Closson, Mosher, and said Hiram, had settled the controversy, and that said Hiram was to write to his brother to relinquish the contract; but he, the witness, does not know that said Hiram went so far as to say that they had settled the matter; but that he said he would write to his brother to relinquish the contract, and that he was confident that he would do it, from the instructions which he had given him. That said Hiram said that he had no doubt but that, if his brother had known the circumstances of the place, and that Mr. Mosher wanted it, he would have had nothing to do with it. That after the said Closson, Mosher, and the said Hiram, had come to the understanding in relation to the farm, which he has mentioned, they separated and left his house; that he, the witness, was *never present* at any other time when Mr. Closson offered

to pay back to said Hiram the hundred dollars which said Joseph had paid him, on account of said farm, as far as he, the witness, recollects. That in the conversation between said Closson, Mosher, and said Hiram, which he, the witness, has stated, he, the said Closson, offered to pay back said hundred dollars to said Hiram, and also pay said Joseph for all the trouble he had been put to in relation to said farm. That said Closson, in said conversation, also stated, that if he had not supposed that Mr. Mosher did not want the farm, he should not have contracted with the said Joseph Slocum for the sale of said farm. That he, the witness, has heard said Closson state that he received two letters when he was in St. Louis, one enclosing a deed from himself to said Mosher for said farm, to be by him executed; and also another enclosing to him the sum of two hundred dollars; in which said last mentioned letter said Mosher requested him to come home, as they could settle their business much better if he was at Schaghticoke, than while he was at St. Louis; and said Closson stated further, that he received both letters the 15th of May, and started for home the 17th of the same May; that the letter enclosing the deed was from Mr. Pierson, and the letter enclosing the money was from said Mosher; that said Mosher, in his letter, requested him, the said Closson, if he did not come home, to execute the deed; but the witness cannot say whether this conversation took place at the interview he has mentioned between said Closson, Mosher, and said Hiram, or at some time previous; that he, the witness, understood from said Closson, that on receiving said letters he started for home for the purpose of executing said deed, and closing the business with said Mosher in relation to said farm.

The counsel for the complainant objected to this testimony of a conversation between the witness and said Closson, which the witness could not say took place at the interview between them, the said Closson, Mosher, and the said Hiram, before stated.

That he, the witness, does not recollect that he was ever present at any other time when said Mosher offered to pay

back to said Hiram Slocum the money his brother Joseph had paid to said Closson, for or on account of said farm; that at the time of the interview before mentioned, William B. Slocum resided in the town of Lansingburgh, where he now lives.

*Gerrit Fort*, being further examined by the counsel for the complainant, says,—that at the time of the interview between said Closson, Mosher, and said Hiram, of which he has spoken in his testimony, he, the witness, resided on the farm in question in this suit, then owned by said Mosher and Closson; that at said interview was the first time at which he had heard them, the said Closson, Mosher, and Hiram, converse together in relation to said farm; that he, the witness, hired the whole of said farm for five years, for the rent of two hundred and fifty dollars per year, and he hired it for another year at the rent of three hundred dollars, and that he paid said rent to said Mosher; that he paid the taxes on said farm, and was allowed the same in the settlement of the rent; that the last year, for which he paid the rent of three hundred dollars, he had the privilege of sowing a full crop, and of taking it off the next year.

*John Wright*, being sworn, says,—that he resides in the town of Stillwater, in the county of Saratoga, and is acquainted with Joseph Slocum, the complainant, and Isaac Closson, and Joseph P. Mosher, the defendants in the above suit; that the latter part of August, or the beginning of September, in the year one thousand eight hundred and thirty-three, Mr. Joseph Slocum, the complainant, came to his store in Stillwater; that a short time prior to said Slocum coming to his store, Isaac Closson, the defendant, came to his store with some comrades; that soon after said Closson came, some one then present said, they are coming; whereupon said Closson asked witness for a room, and said that he wished witness not to tell where he was; that said Closson went into a room up stairs, and remained there some time; that after Closson went up stairs, he, the witness, went out of the house; and after he was informed that Closson had gone, Joseph Slocum came to his store, and said Joseph handed him some money to count, which he count-

ed, and he thinks it amounted to five thousand dollars, but can not be certain as to the amount of said money; that he thinks said Closson remained in the chamber as much as half an hour; that it was from fifteen to thirty minutes after Closson went into the chamber, before Hiram Slocum came to him, the witness, at the wood-house, and inquired for said Closson; that Closson came to his store in the forenoon, and staid there about an hour, before it was said "they are coming," as witness has stated; that Hiram Slocum came to him, the witness, while he was under the wood-house, and inquired for said Closson, before he, the witness, saw Joseph Slocum, and during the time that the said Closson remained in the chamber, as witness supposed. That he, the witness, declined telling said Hiram where said Closson was, but another person told him that Closson was in the chamber; whereupon said Hiram asked permission to go into the chamber to see said Closson, to which he, the witness, consented.

*John Wright*, being *cross-examined*, says—that when said Isaac Closson came to his store, as he has stated in his testimony on his direct examination, he, the witness, thought him to be intoxicated with liquor, and the comrades who came with him were also considerably under the influence of spirituous liquor, and they were very noisy, and, from their appearance and conduct, witness supposed they had set out for a drunken frolic; that said Closson is an intemperate man, and he, the witness, does not know that he has ever seen him of late years, when he did not think him under the influence of spirituous liquor; that they were boisterous and noisy after they went up stairs; that when he, the witness, came into the house from the wood-house, they were still and quiet; that he, the witness, thinks that when said Closson was at his store, as before stated, he was too much intoxicated to be fit to transact any business of importance; that witness did not observe whether he did or did not stagger when he walked.

*William B. Slocum*, being sworn,— The counsel for the defendants objects that his testimony ought not to be taken, on the ground that he is interested in the event of the suit, and for

46

the validity of this objection relies on the testimony already taken in the cause, as having proved him to be so interested; and also on the ground that the defendants will give further evidence of such interest. The testimony is taken, subject to this objection.

The witness says,—that he resides in the town of Lansingburgh, in the county of Rensselaer, and that he is the father of the complainant, and is well acquainted with the defendants in this suit. That he, in the month of June, one thousand eight hundred and thirty-three, went with his wife and daughter to Syracuse, on a visit to his son, Joseph Slocum, the complainant, and they arrived there about the tenth day of said June. On the morning of his arrival at said Syracuse, early in the morning, before breakfast, he saw Isaac Closson, the defendant, at said Syracuse. That before he saw said Isaac, his son, the said Joseph, had informed him that there was a man there who called himself Isaac Closson, of Schaghticoke; that afterwards, in the same forenoon, he, the witness, again saw said Closson, and inquired of him where he had been; he said he had been rambling at the west, and had not stopped long in any place. He, the witness, then asked him if he was going back to Schaghticoke to remain there; he said he was going to Schaghticoke to settle his business, but was not going to remain there. The witness then asked him what he was going to do with his farm; he replied that he was going to sell it. That he, the witness, then informed him that it was an excellent time to sell it; that land in Schaghticoke was very high, and that there was a great many buyers; that he, the witness, then observed to him that he supposed his brother-in-law, Mr. Mosher, would buy it. Upon which the said Isaac replied, no; that he should not sell it to his brother-in-law Mosher. Thereupon he, the witness, asked said Isaac what price he asked for said farm; to which said Isaac replied that his price was thirty dollars per acre. That he, the witness, then told said Isaac, that if he was determined that Maria, meaning the wife of said Mosher, should not have it, that he wished him to see his, the witness', son Hiram, as he thought said Hiram, from his owning the farm

Slocum *agt.* Closson and Mosher.

adjoining it, would like to buy it; to which the said Isaac replied that he would see said Hiram, for he should like that some of witness' family should have it, the farm, as they had always been intimate together, and he had rather that they should have it than any one else, provided that they could agree. That the reason of his, the witness', making this statement to said Isaac was, that his son Hiram had before that time told him, that if said farm was to be sold, he should like to buy it, and then have all his land together. Witness further observed, to said Isaac, that he did not think his son Hiram would buy it if, in so doing, he was going to interfere with Mosher and his wife; that he and said Isaac had no further conversation in relation to said farm on that day, as far as he, the witness, recollects; that on the next day afterwards, he, the witness, again saw said Closson, and the witness remarked to him, supposing you and I should make a bargain relative to the farm, in behalf of said Hiram; to which said Isaac made no reply at that time, and he, the witness, asked him no further questions at that time. That he, the witness, again saw the said Isaac afterwards in the same forenoon, when said Isaac told him, the witness, that if Joe, meaning his, the witness', son Joseph, would buy the farm, that he would sell the same to him; to which he, the witness, replied that he could not tell him anything respecting said Joseph buying the farm, and thereupon said Isaac requested him, the witness, to talk with Joseph respecting it; and he, the witness, then told him, the said Isaac, that he would see and talk with said Joseph respecting it, but that he should not see him until noon; and that he, the witness, would let him, the said Isaac, know in the afternoon what said Joseph said, or that he, the said Isaac, might talk with him himself; that at noon, he, the witness, spoke to Joseph respecting the purchase of the farm; and that said Joseph told him that he was going away that afternoon, and could not then attend to doing anything about it, but that he should be back that night; but he, the witness, told said Joseph that he thought that he would not get back that night, as he was going the distance of eighteen miles; that after thus seeing said Joseph, he, the wit-

ness, told said Isaac what his son had said to him, and he further told said Isaac, that his son Joseph told him that he would buy the farm, if they could agree, and would pay him five hundred dollars down, and the remainder the first of September following; that upon his, the witness, so informing said Isaac of what his son said, the said Isaac said that he did not want more than seventy or eighty dollars down, and the remainder on the first of September, when he calculated to go away; that his son Joseph did not get back that night, but returned the next day; that in the forenoon of the said next day, before said Joseph returned, the said Isaac called on him, the witness, several times, and inquired whether said Joseph had returned; that after said Joseph returned, in the forenoon, before dinner, the witness and said Joseph went down to the warehouse of said Joseph and found said Closson there, and said Joseph told said Closson that he would buy his place and give him his price for it, and pay him five hundred dollars down; to which said Isaac replied, that he did not want more than eighty dollars down; and thereupon said Joseph told him that he did not wish to pay him less than one hundred dollars in such a purchase as that was, or words of that import; and that said Joseph also remarked to said Isaac, that he did not wish to interfere with his, said Isaac's sister and brother-in-law, in making the purchase. To this observation, said Isaac replied, *that they should not have it ;* and thereupon, said Joseph remarked to said Isaac, that either that afternoon or the next day, they would have writings drawn of their bargain; that there was nothing further said in relation to the said farm, at that time, in the hearing of the witness, and soon afterwards they separated; that afterwards, in the afternoon of the same day, the said Isaac called on the said Joseph, and told him that he wanted to have the writings drawn immediately, as a Mr. Wickes had come on from the west, and was about returning to Schaghticoke, and he, the said Isaac, wanted to go in company with him; that they, the said Isaac and Joseph, then went away together, in pursuit of some person to draw the writings, but he, the witness, did not go with them. That said Joseph

did not give him, the witness, any authority to buy said farm for him, nor did he, the witness, ever inform said Closson that he, the said Joseph, had given him such authority; that said Isaac did not ever tell the witness, in conversation at Syracuse, that he had agreed to sell the farm to said Mosher; that he, the witness, did not ever tell said Closson that said Mosher did not want said farm, or anything of that import; nor did he, the witness, ever tell said Closson that he, the said Mosher, was working against him, or calculated to get the farm for little or nothing; that he did not tell said Closson that said Mosher had let the place get down, or out of repair, or anything of that import; that he saw Ashley E. Fish in company with said Closson, at said Syracuse, but did not say anything to said Fish respecting his using his influence with said Closson, to induce him to sell the farm to said Joseph; nor did he, the witness, say anything to said Fish respecting his having influence with said Isaac; that after Closson had left Syracuse some days, witness remarked to Fish, that he supposed he, the said Fish, did not care who had the farm of the said Closson; to which Fish replied, he did not care who had it, if Mosher did not; that he had rather that any other person should have it than Mosher; that he, the witness, never told Closson, or any other person, that Mosher meant to cheat Closson out of the farm if he could, or words of that import; but that said Fish, in the course of the conversation with Closson, made remarks of that import at several different times; that he, the witness, did not treat said Closson with spirituous liquors while they were at Syracuse, and that he had no recollection of his having ever seen him, the said Closson, drinking spirituous liquors while they were at Syracuse, but once, and then said Fish invited him, the witness, and said Isaac, to drink some spirituous liquors with him, which they did; and that he, the said William, did not say to said Closson that he believed that said Mosher meant to cheat him out of the farm, or anything of that import; that he, the said William B., did not see said Closson, while he was at Syracuse, intoxicated, or so under the influence of spirituous liquor, as in any manner to disqualify him to do business, although he,

the witness, believes that said Isaac was in the habit of drink-ing more spirituous liquors than was good for him; that said Closson did not inform him, the witness, while he was at Syra-cuse, that said Mosher had sent out a deed of the farm to him, for him, the said Isaac, to execute; but after Closson went away from Syracuse, the said Fish so informed him, the wit-ness. The said Isaac and said Joseph concluded the bargain for the farm, some time in the forenoon; but the writings were drawn in the afternoon. That said Fish was not present when he, the witness, first saw Closson at Syracuse.

*William B. Slocum,* being *cross-examined* by the counsel for the defendants, says,—that he is confident that the time at which he arrived at Syracuse was on Monday, as he is of anything whatever; that he is not positive where Closson was, when he first saw him at Syracuse, but thinks it was in the street, as he was going to his son's to breakfast; that when he first met with Closson, he, the witness, remarked to him that he was then in a hurry, but that he was not going away immediately, and that he, the witness, should like to see him after break-fast; that he then had no idea of having any business with him, but wanted to see him merely as an old neighbor, who had been gone a long time; that the next time he saw said Closson, he believes he, the said Closson, was at the ware-house, where Fish was employed.

*Question.* Was Mr. Fish present when you saw him, the said Closson, the second time at Syracuse?

*Answer.* I think he was.

*Q.* Did Mr. Fish then, pointing to Closson, ask you, " do you know that man?"

*A.* Witness says—that he does not think that said Fish worded his question in that way.

*Q.* How did Fish word his question?

*A.* Fish said, " here is one of your old neighbors."

*Q.* Was it at this time, or that interview, that you asked said Closson to see your son Hiram, before he sold his farm?

*A.* I think it was not.

*Q.* Did you, at this interview, talk with said Closson about selling his farm?

*A.* I did not.

*Q.* How long was you with Closson at this interview?

*A.* Only a very few minutes.

*Q.* How long was it, after this interview, before you saw Closson again?

*A.* I can't distinctly tell, but it was not a great while.

*Q.* Was it an hour?

*A.* I cannot say whether it was an hour or half an hour.

*Q.* Where was Closson when you next saw him?

*A.* He was on the bridge, called the stone bridge.

*Q.* Was Fish there with him?

*A.* Fish was present part of the time only. He and Closson were there together a long time talking together.

*Q.* How long did this interview on the bridge last?

*A.* I cannot tell; it might have been an hour, it might have been less.

*Q.* Was it at this interview on the bridge that you had the first conversation with Closson, about selling his farm, mentioned in your testimony on your direct examination?

*A.* It was.

*Q.* What time of the day was this interview?

*A.* I cannot tell; it was some time about eight, nine or ten o'clock in the morning.

*Q.* Did you, at that interview, request said Closson to see your son Hiram, before he sold his farm?

*A.* I did so request him at that interview, or expressed a wish that he would so see him.

*Q.* Did Closson then promise you that he would see him before he sold the farm?

*A.* He did so promise me.

*Q.* Did Fish, at any time during this interview, say that Mosher meant to cheat Closson out of the farm, if he could, or anything of that import?

*A.* I don't remember that he, the said Fish, said anything of that import at that time.

*Q.* Did you have any conversation with Closson on that day, after that interview, in relation to the sale of his farm?

*A.* To the best of my recollection, I did not.

*Q.* When did you next have a conversation with Closson, in relation to the sale of his farm?

*A.* On the next day afterwards.

*Q.* Did you see Closson, after your interview on the bridge, until the next day?

*A.* I believe I did not.

*Q.* What time the next day was it, that you saw him?

*A.* In the morning, after breakfast, at seven or eight o'clock.

*Q.* Did you, when you saw Closson in the morning mentioned in your last answer, propose to him your buying the farm for your son Hiram?

*A.* I can not say positively that I made that proposal to him at the first time I saw him that morning, as I saw him several times that morning, but it was at one of the times when I saw him on that morning that I made that proposal to him.

*Q.* How many conversations, on that day, did you have with Closson, about the sale of his farm?

*A.* I think I had two; at the first I proposed to him to bargain with him for my son Hiram, and at the second he proposed to me to sell the farm to my son Joseph.

*Q.* Where was the said first conversation?

*A.* I think it was in the street, not far from the Syracuse House.

*Q.* Was Ashley E. Fish present at that conversation?

*A.* I believe not.

*Q.* Why did you propose, at that first conversation, to buy the farm for Hiram?

*A.* I thought the farm was a bargain, and Hiram, I knew, wanted to buy it, and I was afraid that Closson would sell it to some other person, before he should see Hiram.

*Q.* Did you intend to secure the purchase of said farm, if possible, before Closson left you?

*A.* Yes; I would like to have done it, if I could.

Slocum *agt.* Closson and Mosher.

*Q.* Where was it that you had the second conversation, on that day, with Closson, relative to the sale of the farm?

*A.* I believe I was sitting in the store formerly kept by Mann, at said Syracuse, or one of the stores near that, I can not say which, and said Isaac came to me, and called to me.

*Q.* How long did this last mentioned interview last?

*A.* A very few minutes only.

*Q.* Was Ashley E. Fish present at any time during that interview?

*A.* No; I believe not.

*Q.* When did you have the next interview with Mr. Closson, in relation to the sale of his farm?

*A.* On the same day, in the afternoon.

*Q.* How long did this last mentioned interview last?

*A.* It lasted for a few minutes only, as witness was about to leave Syracuse to go to Salina, on that day.

*Q.* Was Ashley E. Fish present at that interview?

*A.* No; he was not present then.

*Q.* Where did that interview take place?

*A.* Not far from the packet boats lying in the canal.

*Q.* Did you go to Salina that afternoon?

*A.* Yes, I did.

*Q.* Did you see Closson again, until the next day?

*A.* No; I did not see him until the next morning, when he called on me.

*Q.* Did you, after the interview you mentioned near the packet boats, have any conversation with said Closson respecting his selling his farm, before you saw Closson and your son together, the next day after you saw him near the packet boats?

*A.* No, I did not.

*A.* Where did the interview between Closson and your son Joseph take place, at which they had conversation about the sale of the farm?

*A.* In the warehouse of said Joseph.

*Q.* How long did that interview last?

*A.* I cannot tell; I heard a few words of their conversa-

tion, and then went out, and can't say how long they were together.

*Q.* Was Ashley E. Fish present at that interview, while you was there?

*A.* No, he was not.

*Q.* Was you present at any other interview whatever, when there was any conversation with Isaac Closson about his selling his farm, other than those you have stated in your testimony on your cross-examination?

*A.* I have no recollection that I was present at any such interviews, besides those I have already stated.

*Q.* What was it that made you afraid that Isaac Closson would sell his farm before he saw your son Hiram?

*A.* Gerrit Fort lived on the farm, and I knew that he, and several others were anxious to buy it; and I was apprehensive that he, the said Closson, if applied to, would sell it, without waiting to see said Hiram.

*Q.* Were you apprehensive that Closson would sell the farm, if he had an opportunity, before he saw Hiram, although he had promised you that he would not?

*A.* Yes, I was, from my knowledge of mankind.

*Q.* Are you positive that your son Joseph told Closson that he would not purchase this farm, if it was to interfere with Mosher.

*A.* I am positive that said Joseph so told him.

*Hiram Slocum,* being sworn, says,—I live in Troy, and am the brother of complainant. I know both of the defendants. I know of the complainant's calling upon the defendant, Isaac Closson, and went with him myself, I think, on the last day of August, 1833.

We went first to the boarding-house of Mr. Fullers, where he boarded, in Easton. The complainant went in and inquired for him. From there we went a circuitous rout to Stillwater, in the county of Saratoga; we found him at the village of Stillwater, in the chamber of the store of Mr. Wright; he was secreted in that store. When we first went there, he did not come down. The complainant went to the door of the room

Slocum *agt.* Closson and Mosher.

where he was, by permission of the owner, and there told him that he had come to have a deed of land that he had purchased from him, executed, and that he had the deed there with him. Mr. Closson said that he shouldn't do anything about it. My brother at that time asked Closson why he conducted in this way ? Closson replied, several times, that he didn't mean to do anything about it; that he didn't like the survey of the farm. My brother told him that he was willing to pay him for all the land there was, and that he wanted the matter arranged amicably and fairly. Closson pressed out of the room in a good deal of a hurry. My brother took his pocket-book out in the presence of Closson, but did not show him the money. When Closson pressed out of the room, my brother said to him, stop ; that he didn't wish to do anything wrong about it. Closson went out on to the tow-path, and went out of sight. My brother had five thousand dollars with him.

I asked Closson myself if he hadn't had notice that they were going to survey the farm ; he told me he had. The farm had been surveyed only a day or two before finding Closson at Stillwater. It was a farm that belonged to Isaac Closson and Joseph P. Mosher's wife, in the town of Schaghticoke. I carried a notice from the complainant to the boarding-house of Closson, three or four days before this, of the intention to survey the above farm.

When my brother showed Closson the pocket-book, on his coming out of the room above mentioned, the pocket-book evidently looked as if it contained money ; the bills were sticking out the end of it. This room was in the second story of the store above referred to.

I meant to be understood as saying that the amount of money my brother had with him was near five thousand dollars ; it was certainly over forty-five hundred dollars.

*Cross-examined.* At this time the complainant lived at Syracuse, Onondaga county ; he had lived there at that time eight or nine years ; he still continues to live there. I presume he knew that one half of this farm belonged to Joseph P. Mosher, in right of his wife. I do not know what the complainant in-

tended to do with the farm.  I don't know that he contemplated moving back there; I never heard him say that he did.

At the time I found Closson at Stillwater village, there were three or four of his associates with him.  They were in something of a glee.  I didn't discover that Closson, or any one of the company, was intoxicated so as to stagger.  I know what is meant by the term high, when speaking of a person in a frolick.  I can't say that Closson was incapable of answering any question put to him correctly.  I have no doubt that Closson had been drinking liquor; but I can't call to my mind any one circumstance, while I was there, that would induce me to think he was excited.  There was evidently something in his appearance that showed he had been drinking liquor while there.

I was at one time present at Mr. Pierson's office, at an interview between Closson, Joseph P. Mosher, and my brother. the complainant.

I saw the money that the complainant had before I saw Closson at Wright's store.  I don't know as I counted it.  I saw money in the pocket-book of the complainant in the morning of the day when we found Closson.  I don't recollect of seeing the deed before complainant took it out in the above mentioned store of Wright.  I saw a paper which complainant took out there, but didn't read the deed.  I read the deed before this, and after, both.  I have had the deed in my hands.  This paper which complainant had at Wright's, I suppose to be the same paper.

The following depositions were taken on the part of the defendants :—

On this 8th day of September, 1834, personally appeared before me, John E. Lovett, examiner in chancery, *Ashley E. Fish*, a witness produced on the part of the defendants, who, being duly affirmed, and orally examined by the counsel for said defendants, says,—that he resides at Syracuse, in the county of Onondaga.  Knows the parties complainant and defendants, and also knows William B. Slocum and Hiram Slocum : William B. Slocum is the father of Hiram and Joseph

Slocum. William B. Slocum used to reside in Schaghticoke, opposite to where Joseph P. Mosher now lives; Hiram and Joseph Slocum formerly lived with their father.

I am acquainted with the farm now in dispute, called the Closson farm. Joseph P. Mosher, one of the defendants, married a sister of Isaac Closson; as nigh as I can recollect, it is twelve years since he married her; I cannot tell exactly. Isaac Closson and Mrs. Mosher were the only heirs of Robert Closson.

I think that Robert Closson died in the year 1814.

I think it was in the fall of 1827, that Isaac Closson first left here to go into the western country.

In the season of 1827, I lived with Joseph P. Mosher; and there were frequent conversations between Isaac Closson and Joseph P. Mosher, about the purchase of the said farm by Mosher, from Closson; Closson stated that he had rather that Mosher should have it than any body else, as he had married his sister and owned the other half of the farm, and it was the choice of the sister to retain said farm.

The counsel for the complainant objects to any parol testimony, as to the sale or transfer of the farm.

I heard Closson say to Mosher, that if he would give him as much for his part of the farm as any body else, that he had rather that he should have it, on account of his sister—that is, if he sold it.

I saw Isaac Closson at Syracuse, on his return from the west; it was some time in June, 1833.

I saw William B. Slocum there at the same time; Joseph Slocum lives there, and did live there at that time.

I think that William B. Slocum told me that he was there on a visit to his son Joseph; he said that he stopped at his son Joseph's house.

I heard a conversation between William B. Slocum and Isaac Closson, at Syracuse, at the time aforesaid, in which conversation William B. Slocum wanted to purchase said Isaac's part of said farm.

He said that he was authorized by Joseph Slocum, to pur-

Slocum *agt.* Closson and Mosher.

chase the interest of Isaac Closson in said farm, for Joseph and Hiram Slocum, if they could agree upon a price. Isaac Closson told Mr. Slocum that he had been gone a good while, and he did not know how the property then stood; but, that if Joseph Mosher did not want it, that he had as leave sell to the Slocums as any body else.

*Q.* Do you recollect whether Isaac Closson told William B. Slocum that he, Closson, had agreed to sell his interest in said farm to Joseph P. Mosher, and that Mosher had sent a deed out to him, Closson, to be executed and sent back?

Question objected to by complainant's counsel; answer taken, subject to the objection.

*A.* Yes.

*Q.* Did Isaac Closson show the deed to you that had been sent out to him?

*A.* Isaac Closson showed me the deed that had been sent out to him. I don't recollect that William B. Slocum was by when the deed was shown to me; William B. Slocum told Isaac Closson, that Mosher did not want the place; that he, Mosher, had been working against him, Closson, and calculated to get the place for little or nothing.

Slocum said that Mosher had let the place go down, and get out of repair. Slocum called upon me the same day, and said to me, " You and Mr. Closson have been brought up together, and your influence will go further with him than any other person;" and he wished me to use my influence in their behalf in purchasing the farm.

I told Mr. Closson that Hiram and the family of Slocums had always been neighbors of his, and their farms joined each other, and if they would give as much for it as any body else, I would let them have it, providing that Mosher did not want it.

Slocum said that Joseph Mosher meant to cheat Isaac out of the farm, if he could, as he believed.

I saw William B. Slocum treat Isaac Closson two or three times with brandy during his stay at Syracuse.

I should not think that Isaac Closson was in a suitable situ-

Slocum *agt.* Closson and Mosher.

ation to transact business in consequence of drinking; since he went out west, he has got to be very much addicted to drinking; he had altered so much that I hardly knew him.

Joseph Slocum was not present at any of the conversations between Isaac and me, or between his father and me. I saw Closson standing in Joseph Slocum's store door several times.

I was in the next store, and Closson was in and out frequently at Joseph's store and the store where I was. I think Joseph Slocum did not keep liquors to sell in his store; his is a forwarding store. I should think that Closson remained at Syracuse three or four days. I did not see him at any time, while there, when he was not the worse for liquor.

*Q.* Do you recollect whether Closson, in the conversation between him and William B. Slocum, said that Mosher had sent money out to him at the west on account of the farm?

Question objected to by complainant's counsel.

Answer taken, subject to the objection.

*A.* Yes.

*Q.* What did he say?

*A.* Closson observed that he had received the deed, and that money was sent in a letter directed to St. Louis. I think it was five hundred dollars.

And being *cross-examined* by the counsel for the complainant, deponent says: The first conversation I heard between William B. Slocum and Isaac Closson, at Syracuse, was when they met and were talking about the farm. I think Mr. Slocum asked him if he had disposed of his farm, and he said "no." Slocum then remarked that he should like to purchase it for Hiram and Joseph if they could agree, or words to that import. Isaac then stated that Joseph P. Mosher had sent out a deed and a letter with money in it to St. Louis, and that he then had the deed in a valise or trunk. Mr. Slocum remarked that Mr. Mosher did not wish to purchase the place; that he, Mosher, had worked against him, Closson, as he thought, while he was gone, and meant to get the place for little or nothing; he said he should like to buy the place for them, as it adjoined

their farm; should like to buy, if they could agree upon a price.

Mr. Closson remarked, that if Mr. Mosher did not wish to buy the farm, that he had as leave sell to them as to a stranger, or to anybody else, if they would pay as much as anybody else. I don't recollect particularly of anything more said at the first interview. I think this conversation was the second day after Closson arrived at Syracuse; they had seen each other before this conversation; I think they had seen each other the day before, and I think I was present when they first met. Closson was in the store where I was, and Mr. Slocum was passing by, and I spoke to him, and asked him "Do you know this young man?"

This conversation, that I have been speaking of in my cross-examination, was in the store.

Mr. Slocum arrived in Syracuse on the day that I asked him the question as above stated, as Slocum informed me. I don't recollect that I heard any conversation between them after the time above spoken of in my cross-examination.

*Q.* How long were Mr. Slocum and Mr. Closson together at the time of the conversation on the second day after Slocum's arrival in Syracuse, as stated in your cross-examination?

*A.* I could not tell exactly,—it might have been an hour, and possibly less; the whole conversation was not upon this subject; they talked upon other subjects after they had first spoken upon this.

*Q.* Do you recollect that Mr. Slocum, early in that first conversation, remarked to Closson, that it was a good time to sell land in Schaghticoke; that land was high, and that there was a number that wanted to purchase?

*A.* I have no recollection of it; it was the same day with the above conversation above spoken of in my cross-examination, and in the afternoon, that I spoke to Closson respecting his selling to Slocum.

*Q.* Did you invite Mr. Slocum and Mr. Closson to go into a grocery and drink?

*A.*  Yes.

*Q.*  Whose grocery was it?

*A.*  L. A. Cheeny's, right opposite, across the canal, from where I was.

*Q.*  Which day was that?

*A.*  I presume it was the second day; I cannot recollect.

*Q.*  Did you ever pay for the liquor?

*A.*  Yes.

*Q.*  Did you and Mr. Slocum drink anything together after that?

*A.*  We might have drank together, both before and after that; I don't recollect.

*Q.*  Did you three drink together, at any other time than the time above referred to?

*A.*  I don't recollect; there was no liquor for vending in the store where I was employed; I don't recollect that Mr. Slocum drank anything in the store where I was employed; I did not, to my knowledge, see Mr. Slocum and Mr. Closson drink together at any other time than that above stated.

I was a clerk, and my employment was seeing to the loading and unloading boats, and delivering and receiving goods and grain; there was a bookkeeper in the store; I was in the house of Johnson, Howlett & Co.

*Q.*  What were your wages per month?

*A.*  My wages, as allowed in the settlement from the commencement, were fifteen dollars per month; my wages were sometimes greater than at others.

*Q.*  Before Closson went west, did Mosher offer to sell out to him?

*A.*  I think there was at one time a conversation, when an offer was made by Mosher to sell out to him, or buy from him

*Q.*  When did you leave Schaghticoke?

*A.*  In October, 1827, I think; I was only once there after that; that I think was in November, 1827, and have not been there since, until within the last two or three weeks.

47

*Q.* Did you see Closson drink at any other time than with you and Mr. Slocum, at the time you have related ?

*A.* I don't recollect.

*Q.* Can't you mention the number of times that you drank with Closson ?

*A.* I cannot.

*Q.* Did you drink with him every day while he was in Syra-cuse, after you first saw him ?

*A.* I should think probably I did.

*Q.* Did Closson say to you, or in your hearing, that he would not sell to Mosher; that Mosher had maltreated him ?

*A.* He said this, as nigh as I can recollect,—that if Mosher had tried to injure him since he had been gone, and to get his property for less than its value, that he would not let him have the place, or that he did not know what occasion he had to do it.

*Q.* When did he say that ?

*A.* I think it was during the same day, and after the same conversation above spoken of in my cross-examination ; I don't recollect that anybody else but himself and myself were pre-sent ; I don't recollect whether Mr. Slocum was then present or not.

*Q.* Did you hear Mr. Slocum state to Mr. Closson, that if Maria wanted the place, neither Hiram nor Joseph would wish to purchase it ?

*A.* I have no recollection of it.

*Q.* Did you tell Mr. William B. Slocum that Closson would not sell the place to Mr. Mosher ?

*A.* I cannot recollect ; I might have said so, or made that remark, but my impression is, that I stated to Mr. Slocum, that Isaac had told me that if that was the case, that he, Mosher, had been trying to injure him, that he would not sell him the place.

*Q.* Did you know when Closson left the village of Syra-cuse ?

*A.* I think it was the evening of the next day after the conversation above alluded to.

*Q.* When was the conversation between you and Slocum ?

*A.* It was in the evening of the same day of the conversation between me, Slocum and Closson, or the day following that.

*Q.* When was it that Slocum asked you to use your influence with Closson to get him to sell to his sons?

*A.* I think it was the same day with the main conversation.

*Q.* What was your reply to his request?

*A.* I remarked that it was none of my business; that if Hiram wanted the place, and Mr. Mosher did not, that I had rather, if I was in Isaac's place, sell to him than to a stranger. I told him that I would see Isaac, and talk with him about it. I told him that Mr. Mosher had always been a good friend of mine, and that I did not want to meddle with the business.

*Q.* Was this after you had seen the deed?

*A.* Yes.

*Q.* Had you seen the deed before the conversation between Slocum and Closson about the farm?

*A.* Yes.

*Q.* Did Closson complain to you that Mosher had not sent on money of his that he held in his hands, and find fault with him in consequence of it?

*A.* I have no recollection of it.

And on the second *direct examination* by the counsel for the defendants, deponent says,—I recollect well of drinking with Mr. Slocum and with Closson separately, and also together, all three of us at the time mentioned, in the grocery; I recollect no other time that we three drank together.

*Q.* At what time did you see Slocum and Closson drinking together?

*A.* I should think at twelve o'clock at noon, at Cheeny's, the same grocery where we three had drank together in the forenoon. I had been to the collector's office, and was keeping Cheeny's; Isaac called me in and asked me to drink; I told him that I did not care about it, and walked along and left them there.

And on the second *cross-examination,* the complainant's counsel asked the following question:

Was it Isaac that was treating at that time, or was it Slocum that was treating?

*A.*    That I cannot say; I only halted a minute, and went on.

*Monroe County, ss:*—On the twenty-first day of July, 1835, before me, Isaac Hills, examiner in chancery, appeared the parties in this cause, by their respective counsel, and proceeded to take testimony in the same, when

*George C. Allen* was called as a witness on the part of the defendants, who, being sworn, says,—That he resides in the city of Rochester, in the county of Monroe, and is sixteen years of age; he says he knows the complainant, and Mr. Closson he has seen occasionally, and Mosher he knows when he sees him; he lived with Mr. Slocum in June, 1833, and lived with him at the time when a contract was made between the complainant and Isaac Closson, relative to a farm in Schaghticoke; he believes Mr. William Slocum (said to be the father of Mr. Joseph Slocum,) was present at the time of the making of the contract, and went away after it was done; witness was not present when the bargain was closed; was present and heard the parties talking about the sale before the contract was made, and heard them say afterwards that they had contracted; Closson went away the day the bargain was made; after it was made, he was back again in a day or two; he heard something said similar to this, that the land was bought for William Slocum, don't recollect who it was that said it; he heard it said when in the warehouse; there was a number there; Nichols was a clerk there; he can't name the others who were present; heard it said that the farm was worth considerable more than was to be paid for it, but don't know who said it; can't say whether he did or not hear Joseph Slocum say that it was worth more than the contract price.

On *cross-examination* by complainant's counsel, the witness says he is not certain, but he don't think Joseph Slocum was present at the conversation which took place in the warehouse;

he believes Mr. Closson first proposed the contract to Joseph Slocum; did not hear Slocum tell Closson he had better keep the land; should think Closson was sober; the proposals relative to the purchase and sale of the land were in the morning; he recollects that Joseph Slocum left town that day, but whether before the writings were executed or not, he does not know.

On a further *direct examination,* the witness says he don't know how long Mr. Slocum was gone, but should think he was gone over night, or returned during the night; don't recollect that he heard anything said between Mr. Slocum and Mr. Closson on the subject of the land, after Mr. Slocum's return; Closson was there two or three times; when he first came there, he should think he was sober, but at some of the other times he had the appearance of being in liquor; witness says he heard no conversation about the land, except the first time that Closson came there, and at that time he appeared to be sober.

*George W. Fish,* being sworn, says,—That he resides in the city of New-York, and formerly resided in the town of Schaghticoke, in the county of Rensselaer, is thirty years of age, and is acquainted with the parties complainant and defendants in this suit. That some time in the month of June, in the year 1833, he saw the defendant, Isaac Closson, at the town of Schaghticoke; soon after he returned from the west, and at the request of said Isaac Closson, he went to see the complainant, Joseph Slocum, to Syracuse, in company with said Closson. That his object in going to see said Slocum was, to see if said Slocum would not relinquish his contract with said Closson, for the sale of his farm in Schaghticoke; this was in the latter part of said June, in the year 1833. That he then saw the complainant at Syracuse; that said Closson told the complainant that he found, on his arrival at Schaghticoke, that Joseph P. Mosher wanted the farm, which, at the time he made the bargain with Slocum, he had been given to understand that said Mosher did not want the farm, which was the reason of his making the contract with Slocum for the farm; said Closson told Slocum that he rather wished said Mosher should have

the farm; that it was his intention to have let him have it, if he, Mosher, wished it; that he did not tell Slocum that he had previously offered the farm to Mosher, or that there was any contract with Mosher respecting it; that he does not recollect that he, Closson, then told the complainant by whom he had been given to understand that Mosher wanted the farm; that said Slocum appointed several times for them to meet him, that they might talk the business over, and have it understood, that there should be no trouble about it; they were at Syracuse two days or more; that they repeatedly called at the times appointed, and sometimes they found Slocum, and sometimes he was absent; when present, he would appoint another time to see them; and when they saw him, he always told them that there should be no difficulty about the business; and told them he should be at Schaghticoke in a few days, and he would see Mr. Mosher and Mr. Closson together, and they would have the matter settled without difficulty; that Closson told the complainant that he was willing to pay him back the $100, which Slocum had paid him, and pay him for his trouble, if Slocum would give up the contract for the farm; that Slocum said, that it would make no difference as to his paying him then; that he should be down in a few days, and then the business would be settled; that the complainant said that he bought the farm for his father, William B. Slocum.

*Gerrit Fort*, a witness already examined on the part of the complainant, being again called and examined on the part of the defendants, says,—That he was present at a conversation between Hiram Slocum and Joseph P. Mosher, at the house of said Hiram, in Schaghticoke, in the month of August, in the year 1833. Said Mosher asked said Hiram, why he had not written to Joseph Slocum, as he had agreed to do; that said Hiram replied, that it was on account of his having since seen his father, William B. Slocum, and what he had told him.

*Gerrit Fort*, being *cross-examined* by the counsel for the complainant, says,—That said Hiram Slocum, in his conversation with Joseph P. Mosher, stated on his direct examination, further added, that his brother had received a very unkind let-

ter from said Mosher; that he, the witness, does not know that there was anything said in that conversation as to the time when said Hiram was to have written to his brother, Joseph Slocum.

*Gerrit Fort*, being further examined on the part of the defendants, says,—that he don't know that it was stated in that conversation when Joseph Slocum received the letter from said Mosher, mentioned in his testimony on his cross-examination.

*Daniel Southwick*, a witness produced, sworn, and examined, in a certain cause, pending and at issue in the court of chancery of the state of New-York, before the chancellor, in which Joseph Slocum is complainant, and Isaac Closson and Joseph P. Mosher are defendants, on the part of the defendants, testifies and deposes as follows, to wit :—

*Daniel Southwick*, being sworn, says,—That he resides in the city of Troy, and is by profession a merchant, and is acquainted with Isaac Closson and Joseph P. Mosher, the defendants in the above suit, but is not acquainted with the complainant. That on the 23d day of April, in the year 1833, the defendant, Joseph P. Mosher, called on him, and told him that he wanted to forward $200 to Isaac Closson, at St. Louis, Missouri; that he, the witness, did, on that day, enclose $200 for him in a letter directed to Isaac Closson at St. Louis; which letter, enclosing the said money, he, the witness, put into the office in Troy. The counsel for the complainant objects to testimony of any conversation between witness and Mosher when complainant was not present, and the testimony is taken subject to that objection.

*Job Pierson, Esq.*, counsellor at law, being sworn, says,— that in the month of April, in the year 1833, he put the blank deed, now presented to him at the time of his examination, marked Exhibit H, enclosed in a letter, directed to Isaac Closson, then at St. Louis, in Missouri, into the post-office in the town of Schaghticoke, or Troy, with a request for him to execute the same, and return it to him, the witness, or to Dr. Joseph P. Mosher, by mail; and the witness further says, that

he is acquainted with the hand-writing of Isaac Closson, and has seen him write, and that the name, Isaac Closson, subscribed to the paper writing now produced, and shown to him at the time of his examination, marked Exhibit No. 1, he believes is the proper hand-writing of the said Isaac Closson; and that the residue of the contents of said paper writing not subscribed with his name, is in the hand-writing of the said Isaac Closson; and that the signature of the paper writing, now also shown to him, at the time of his examination, marked Exhibit No. 2, and the contents of the same paper writing, marked Exhibit No. 2, he believes is in the proper hand-writing of the said Isaac; and also, that the paper writing now shown to him, at the time of his examination, marked Exhibit No. 3, and the name Isaac Closson signed to the same, and the contents thereof, he believes are in the hand-writing of the said Isaac Closson; and also, that the name Isaac Closson, subscribed to the paper writing, marked Exhibit No. 4, now produced and shown to him, at the time of his examination, he believes is in the hand-writing of the said Isaac Closson; and also, that the name Isaac Closson, subscribed to the paper writing now produced, and shown to him at the time of his examination, marked Exhibit No. 5, he believes is in the proper hand-writing of the said Isaac Closson; and also, that the name Isaac Closson subscribed to the paper writing now produced, and shown to him at the time of his examination, marked Exhibit No. 6, he believes is in the proper hand-writing of the said Isaac Closson.

*Charles R. Mosher,* being sworn, says,—that he resides in the town of Easton, in the county of Washington. Is a physician and surgeon; is acquainted with the parties complainant and defendants in this suit; that he is a deputy post-master in said Easton, and has been such post-master about eight years; and is a brother of Joseph P. Mosher, one of the defendants in this suit; that some time in the year 1831 or '32, the said Joseph P. Mosher, in his presence, enclosed the sum of $200 to Isaac Closson, at St. Louis, in the state of Missouri, which letter, enclosing said sum, he, the witness, as deputy post-master,

forwarded by the mail to him, the said Isaac Closson, at St. Louis.

*Question.* Did your brother, at the time of enclosing said money, inform you for what purpose it was sent?

To this question the counsel objects, and the answer is taken subject to that objection; and witness says,—that it is his impression, that he stated that the money was sent to Closson on account of the purchase of his interest in the farm in question in this suit; but that he can't be positive that the said Joseph P. Mosher told him for what purpose the money was sent; that he has known his brother to enclose money to said Closson, and he thinks at several different times; but the number of times, and the particular time of such enclosures, he does not recollect; and that it is his impression that, at the time of those enclosures, the said Joseph P. Mosher informed him that the money was sent to Closson on account of the purchase of his interest in said farm.

*Charles R. Mosher,* being *cross-examined* by the counsel for the complainant, says—that he does not recollect that his brother forwarded any money to said Isaac Closson, after he forwarded the $200 mentioned in his testimony on his direct examination, and cannot say at what time the other moneys forwarded by his brother, Joseph P., were forwarded to Isaac, whether before or after the $200, and that he cannot say that he recollects that any money was forwarded to him by his brother, after the forwarding of said $200.

## Exhibit H.

Contains a warranty deed, between Isaac Closson of St. Louis, in the state of Missouri, of the first part, and Joseph P. Mosher, of the town of Easton, in the county of Washington, and state of New-York, of the second part—date blank—consideration $3000—containing general boundaries of said farm in question—supposed to contain 210 acres—not executed

EXHIBIT No. 1.

*St. Louis, Dec.* 25, 1828.

An opportunity presents itself again for me to write home. I have wrote twice, and received no answer ; but I am in hopes this trial to have some news.    Except a severe turn of the billious fever last August, I have been extremely hearty.    I have been travelling about this world almost continually, waiting an opportunity of going to the mountains, but as yet have had none ; but I shall start the 1st of next April.    I shall be likely to stay some two or three years.    I have hired myself to Mr. Loublet at $400 a year.    As Ashley has made money enough, he has stopped that business.    I arrived at St. Louis the first day of April ; after remaining at that place two or three days, I got on a boat bound for the Council Bluffs, one thousand miles up the Missouri river ; returned in about a month and a half.    I then started in a boat for Fever river, five hundred miles up the Mississippi, to the extensive back mines ; after staying there about a week, I started in a boat for St. Peters, at the Falls of St. Anthony.    I returned from that place to this about the middle of August ; I was taken sick, and confined about three weeks, at no small expense ; after recovering my health, I went up the Illinois lumbering.    I was so unfortunate as to lose the two first rafts, on the snags and sand bars.    I have since been lucky.    As ice now begins to run so thick that there is no more business to be done at present, I shall take up winter quarters about twenty miles up the Illinois, and run my lumber down early in the spring.    Write to me about everything, as you know I am not fond of writing.

Yours, &c.,

ISAAC CLOSSON.

JOSEPH P. MOSHER.

In particular, I want you to send me $100 in United States paper, in one bill if you can.    I want to purchase a lot of land on the Illinois, which I conceive to be valuable, and shall not

Slocum *agt.* Closson and Mosher.

be able without assistance; direct the same to St. Louis; by doing this you will oblige your friend. I can get returns from St. Louis every week; probably the reason of the letters that I wrote never reached, on account of my sending them on steamboats to be put in office at Pittsburgh. I have no more at present.                                                        I. C.

## EXHIBIT No. 2.

*January* 30, 1830.

*Dear Brother-in-law :*—I enjoy the present opportunity of informing you that I am still alive and in good health, hoping you all the same luck. I have been from St. Louis about one year. I started up the Illinois, not calculating to stay long, but a drove of cattle starting from Naples, I started with them for Green Bay; from there I got on board of a keel boat bound for Prairie du Chein, six miles above the mouth of the Ouisconsin river; from there I got on another boat, bound for St. Peters, at the Falls of St. Anthony; I returned to the mines at Fever river, staid there the summer, fall and part of the winter; from there to St. Louis, where I am at present. Concerning the letters that you sent on for me; when I went up the river, I told James Woods to take the letter out of the office and secure it for me; while I was gone up the river, he received the two letters; not hearing from me for some time, made use of the money, calculating to return it when he would again see me; but he is now at New-Orleans. I hear that you have removed to Union Springs, at Cayuga Lake. Mr. Sterrett and myself have purchased a lot at the Upper Rapids, on the Mississippi, for the purpose of keeping groceries and provisions, and shall be under the necessity of again calling on you for assistance; I shall want at least two hundred dollars; be quick as possible, if you please. Write to me about the affairs at large. I shall remain your friend.
(Signed,)
ISAAC CLOSSON.

EXHIBIT No. 3.

*St. Louis, February* 18*th,* 1831.

*Dear Brother-in-law:*—It must seem strange to you that I have not answered your letters before this, but it has not been through neglect on my part. The reason is, after I requested you to send me $200, I had some business with Mr. Jackson, who was running a boat up to the mines and to Prairie du Chein, up the Mississippi, and went up with him; I directed Mr. Steritt, in St. Louis, to take out your letter and keep it until I returned; after I got to Prairie du Chein, I was taken with the ague, which lasted about three weeks before it could be stopped; I then returned to Galena; I there was taken with the fever and some chills, and had to stay there for two months before I could start down; and after starting, I did not get down further than the Rapids, and lay there for some time; after gaining strength to go, I started on a keel boat, there being no steamboat running, the river was so low. By exposing myself in the winter, I was taken worse, but still kept on the boat until I got to St. Louis; when I got there, I found that Mr. Steritt had gone to the mountains; I went to the post-office and inquired for letters for myself; they told me there were letters for a person of that name, but was forbid letting them go unless positive proof of my name. This was in October; I was yet unwell. Some of my particular friends were living about six miles from St. Louis; I got in a boat and went up; my sickness kept on. About the first of November, Mr. Steritt came down from the mountains, took out the letters and fetched up to me; I grew worse from that time until Doctor Campbell gave me up for gone; other doctors from St. Louis was employed, but thought there was no chance for my recovery; they could not tell my complaint, and did nothing but pour calomel into me, until they had got about 260 grains into me at one time without operation. About this time, the fever fell into my head and set me crazy; I remained so for some time; after I began to recover, I was recommended to

go into the woods, where I would be out of the noise. I started up the river, and encamped about the Illinois river; was there taken sick again, suffered much; when I began to recover, I gained fast, and am at this present time well; I could not send to an office on account of snow, which is deep; I waited for a break of the winter to come down; being anxious to write, I broke my road through the snow. You reminded me of your power of attorney was out, but sickness prevented me from renewing it; you told me that you would buy the farm; I want to sell, for I am broke; my sickness expenses have cost me everything and more; I must have suffered if you had not have sent me the $200 that I requested; I want you to send me $200 more, if it be in your power, and tell me what you will give for my part of the farm, and how you will make payments. I have pitched upon a place about the rapids of the Illinois, to spend the remainder of my days; I am tired of travelling. I still remain your friend.

(Signed,)

Isaac Closson.

Exhibit No. 4.

*St. Louis, March* 15, 1831.

*Dear Brother-in-law:*—I have lately dropped a line to you concerning my delay in not writing; I told you the reason of my not writing before; I told you the desperate spell of sickness that I had, which was the reason not answering your letters. I informed you I received your letters, and $200 that I requested. I went up the Illinois river in the woods, as was recommended by the physicians of St. Louis, having no chance of getting a letter to the office, no roads broke, snow was deep; I broke my road through the snow for the purpose of writing; I wrote a letter dated the 18th February, 1831; went up again, and have again returned to St. Louis; I again write this short note for fear; you told me that you want my part of the farm; I told you to write how and when; I want to sell;

likewise, I requested you to send me $200, which I stand in need of; I have my health at present; accommodate me if you can. I give my love to my sister and all.

Your sincere friend,     (Signed,)

ISAAC CLOSSON.

EXHIBIT No. 6.

*St. Louis, March,* 25, 1833.

*Dear Brother-in-law:*—I received a letter from you, dated March 4th, 1833, stating that you are aware that some persons inquiring of Franor are imposters. I received your letters, enclosed with $200; I answered as a receipt; it appeared that you have not received the letter. I have not wrote since, concerning the farm. I want you, if you can afford, to give me $30 per acre; you can take the place; I want you to let me know immediately. If you don't want the place, I will come or send a power of attorney, if you will accommodate me as soon as possible with returns. The little other affairs, if you fix, it will be an accommodation, in full confidence that you will do me justice. If I have a sister living, give her my respects. For instance, we bound our farm on the north by Isaac Fish's; east Williams, Richard Bryan, Sam. Wilber, Thomas Slocum, Bucklin Coon, items which I think will satisfy you that I am Isaac Closson. If it will be your pleasure, as I have started some little business, if you could accommodate me with some $2—300, it would

Your friend,     (Signed,)

ISAAC CLOSSON.

To J. P. MOSHER.

EXHIBIT No. 5.

*St. Louis, November* 18, 1832.

*Dear Sir:*—I received intelligence of a letter directed to the P. M. of St. Louis, stating that a letter was directed to the care of J. Steritt; I was at the post-office at the time the let-

ter should be there ; I inquired for the same ; the P. M. told me there was no letter for him or me ; I called again, and from his conversation was satisfied there was ; I put a letter immediately into the post-office, directed to Joseph P. Mosher, Union Springs, &c. I waited the usual time, received no answer.; I then thought to stop ; after receiving intelligence of this letter, dated the 24th of May, received the 7th of June, and sent to me the 15th of November, I thought to write again ; I received no information of you or my sister, the letter being from Charles R. Mosher ; I at present enjoy good health ; I want to come home this fall, if possible, but, without assistance, impossible. If you could assist me with $200, you would oblige your friend.

Isaac Closson.

To Joseph P. Mosher.

The depositions of the witnesses for the respective parties having been taken, an order was entered with the register of the court of chancery, on the 23d day of November, 1837, closing the proofs ; and on the 18th day of December following, an order was entered, referring the cause to the vice-chancellor of the fourth circuit for a hearing.

On the 26th day of July, 1838, a hearing was had before Hon. John D. Willard, vice-chancellor of the fourth circuit; who afterwards, on the 18th day of August following, delivered the following opinion :—

If Joseph P. Mosher purchased the premises of Isaac Closson subsequent to the contract entered into between the complainant and the said Isaac, and with notice of said contract, and not in pursuance of an agreement made between him and the said Isaac of an earlier period, he is a proper party to this bill; and all other things being established, his deed is liable to be set aside in order that a specific performance may be decreed of the agreement between complainant and Closson. (*See* 5 *J. Ch. R.* 231.)

That every individual should fulfill his contract, so long as the power to do so remains with him, must be admitted to be

Slocum *agt.* Closson and Mosher.

a moral obligation. According to the established forms of the common law, there was no remedy afforded in case of a breach of contract, except in the nature of pecuniary damage for the wrong sustained. This mode of redress was at an early period of the law found to be defective, and in many cases wholly inadequate; hence the court of chancery, possessing more complete control over parties, and moulding its decrees to the particular circumstances before it, acquired, at an early day, jurisdiction of this class of cases, and afforded relief in cases where the common law failed.

But to induce this court to interfere, two things must be made out on the part of the complainant. 1st. That the legal remedy is inadequate, and that without a specific performance injustice would be done, or irreparable injury produced : And, 2d. That the contract is fair, just, and reasonable, equal in all its parts, founded on an adequate consideration, and free from fraud, misrepresentation, or surprise. As the remedy for a breach of a contract is, under ordinary circumstances, confessedly at law, the party who seeks to invoke the aid of a court of equity, holds the affirmative, and must make out a case entitling him to the relief sought. It is not enough, to entitle him to a decree, to prove, as in a court of law, the execution of the instrument. The form of the bill, as well as the ordinary course of the court in this class of cases, imposes on the complainant a greater burden.

It will not be necessary, to a correct decision of this cause, to review all the cases which have been cited. The general principles, applicable to the present remedy, are correctly stated in the last edition of *Fonb. Eq.* 45 to 48, *and notes, and* 281, *et seq.* 2 *Story Equity, title Specific Performance.* The doctrine, too, was correctly stated by chancellor KENT, in *Seymour* v. *Delancy,* (6 *J. Ch. R.* 222,) and by chief justice SAVAGE, on delivering his opinion in the same case in the court of errors, (3 *Cowen,* 445.) Although the decree of chancellor KENT was reversed by the court of errors, and although chief justice SAVAGE was in the minority in that court, it is obvious that the reversal was occasioned by a difference of opinion as

to the facts proved in the case. SUYDAM, senator, delivered the prevailing opinion, and it will be seen, by an examination of it in 3 *Cowen, page* 530 *and* 531, that, in his judgment, the facts did not sustain the opinion of the chancellor and chief justice. There is nothing else in his opinion that can in the least shake the legal positions of those distinguished jurists. They are as much entitled to our respect, as authority, as if the decree had been affirmed.

The case of *Seymour* v. *Delancy* turned mainly on the question whether there was such inadequacy of consideration, as to induce a court of equity to refuse to carry it into effect. The chancellor and chief justice were of that opinion. It was agreed on all hands that there is a distinction between the exercise of the power of the court in setting aside agreements for fraud, inadequacy, and the like, and in decreeing their specific execution. It was conceded that the court might lawfully *refuse* to compel a specific performance of an agreement which it could not *set aside,* and against which it could not *relieve,* if it was once executed by the parties.

The reason for this diversity may in part be found in the fact, that an application for a specific performance of an agreement is addressed to the sound discretion of the court, and is not to be exercised when the plaintiff has so conducted as to forfeit his claim to its interposition. These are well established principles.

It is important, then, to consider whether the plaintiff's conduct in the present case commends his cause to the favorable notice of the court.

It is alleged that William B. Slocum, who acted as the plaintiff's agent in procuring the contract in question, assisted in getting the defendant, Closson, intoxicated, and that he made false statements to him, having a material influence on his mind, and which probably induced the contract.

It is evident that Closson was addicted to the excessive use of ardent spirits; that this was known to plaintiff and William B. Slocum; that Closson had before this made up his mind to sell the premises to his brother-in-law, the other defendant;

48

that a part of the consideration was advanced by the latter to Closson, and that these facts were known to William B. Slocum at the time he made the bargain.   It is probable, also, that Slocum induced Closson to believe that his brother-in-law, Mosher, did not want the place ; that he had treated him unfairly, by letting it go to ruin with a view to get it for nothing; that Mosher wanted to cheat Closson out of the place ; and that he then excited a hostile spirit in the bosom of Closson towards his brother-in-law.   These facts are all proved by one witness positively ; and some positions of the most material parts of this testimony, are strongly corroborated by other witnesses. I shall therefore assume that the facts are true.   On the score of credibility, Fish is to be preferred to Wm. B. Slocum.

It remains to consider what effect these facts ought to have on the agreement in question.   That the representations made by Wm. B. Slocum, as to Mosher, were entirely false; and that they were the means by which he induced Closson to change his mind and to sell the place to the plaintiff, after it had been made up to convey to Mosher, I have no doubt.   In *Livingston* v. *The Peru Iron Company*, (2 *Paige*, 390,) the chancellor decided that a purchase would be set aside, obtained by a representation that the land was good for nothing but a sheep pasture, when the purchaser knew it contained a valuable iron mine.   In the discussions of that case, the chancellor was led to remark on the difference between an application to set aside a conveyance already made on the ground of fraud, and a bill to enforce specifically an agreement obtained by the same fraud.   And he observes that he was not aware of any case in this country, in which an agreement was *set aside* on a mere suppression by the buyer of a fact materially enhancing the value of the property ; but he observes, the court will not enforce the specific performance of the contract, if the complainant has intentionally concealed a material fact from the adverse party, the disclosure of which would have prevented the making of the agreement. The assertion of a falsehood is equivalent to the concealment of a fact.   If the falsehood asserted be of a matter sufficiently important to induce the making of a contract, it is enough to

prevent the aid of this court to enforce it.   The parties must be left to their remedies at law;—this court will not countenance falsehood or fraud, nor aid a liar in his wicked design.

Nor should it be forgotten, that Closson was a man of intemperate habits.   Although the defendants have failed to show that he was intoxicated when the contract was made, it is nevertheless evident that a man of such habits would be more accessible to impositions, and his temper more easily excited, than a man of sobriety.   The assertions made by Wm. B. Slocum, as to the conduct of Mosher, were calculated to have a controlling influence on the mind of Closson.   In short, they induced him to make the contract.   Those assertions were false.   No attempt has been made to prove that they were true.

If it be said that the morality of trade will justify a departure from truth, and that each party deals with the other at arms' length, it may be answered that such considerations are applicable only to proceedings in a court of law, which disregards any unfairness, inadequacy of price, or misrepresentation, unless of so gross a character as to amount to actual fraud.   A court of equity holds to a pure system of ethics.   It withholds its aid from the party who seeks to enforce an unfair or unconscionable bargain; and lends it only to prevent the other party from practicing a fraud.   The party who calls for its cooperation, must show himself entitled to it by the honesty and integrity of his conduct.   If the contract has been obtained by misrepresentations, a court of equity leaves the parties to their legal remedies.

With regard to the defendant, Mosher, the bill should doubtless be dismissed with costs.

In making the purchase of the farm in question, he merely consummated a bargain which he had commenced negotiating before the plaintiff made any proposition to buy.   It is unnecessary to affirm that the bargain between him and Closson had been so far completed when the contract between Closson and plaintiff was entered into, as to entitle him to the aid of this court to enforce its specific execution.   The bargain between

Mosher and Closson was broken off by the misrepresentation of the plaintiff or his agent.    It was natural that Closson, when he found he had been imposed upon by the plaintiff, should refuse to carry the contract into effect, and should fulfill his original design.    The plaintiff foresaw that such would be the case, and hence the anxiety of Wm. B. Slocum to have the contract reduced to writing before Closson could see Mosher. The complainant, in fact, has no equity against either defendant, and the bill must be dismissed as to both, with costs.

A decree was, on the 18th Sept., 1838, accordingly entered, dismissing the bill, with costs as to both defendants.

From the whole of this decree the complainant appealed to the chancellor, which appeal was brought to a hearing on the 26th day of August, 1840, and the chancellor afterwards, and on the seventh day of March, 1843, delivered the following opinion :—

The CHANCELLOR.—This is an appeal from a decree of the vice-chancellor of the fourth circuit, dismissing the complainant's bill.—It is unnecessary to go into a critical examination of the facts in this case, as I concur with the vice-chancellor in his conclusion, that the contract, of which a specific performance is sought, was unfairly obtained ; and that a court of equity ought not to enforce its performance as against either of the defendants.    But if the complainant has any claims whatever against the defendant Closson, he should be left to his remedy at law.    The decision of the vice-chancellor was, therefore, right in this case ; and the decree appealed from must be affirmed with costs.

From the decree of the chancellor, affirming the decree of the vice-chancellor, the complainant, Slocum, appealed to the court of errors.    The proceedings subsequently were transferred to this court.

*David L. Seymour, attorney and counsel,* and
*Joshua A. Spencer, counsel* for appellant.

*First.*    There is no proof of a prior valid contract between

Isaac Closson and Joseph P. Mosher, to sell the property in question. It amounted to a negotiation—a proposal for a sale merely. (*See Exhibits No.* 3, *pp.* 57, 58; *do. No.* 4, *p.* 59; *do. No.* 5, *pp.* 59, 60; *Testimony of William M. Dennis, pp.* 22, 23; *Carr* v. *Duvall,* 14 *Peters,* 77.)

*Second.* Although decreeing the specific performance of a contract is a matter resting in the discretion of a court of equity, yet that discretion is subject to certain established rules, and among them the following :—That a specific performance will always be decreed when the contract is in writing, is certain; is fair in all its parts; is for an adequate consideration; and is capable of being performed. (2 *Story's Eq. Juris. p.* 60, § 751; *Fonb. Eq.* 46, *note* 2, *and cases there cited; Seymour* v. *Delancy,* 3 *Cow.* 525.)

This contract has all the above requisites. (*See contract as stated in the bill, pp.* 4, 5; *and testimony of Wm. B. Slocum, pp.* 29 *to* 37, *inclusive; testimony of Gerrit Fort, p.* 24; *and John Wilkinson, pp.* 19, 20.)

*Third.* Joseph P. Mosher having purchased of Isaac Closson, with knowledge of the previous contract between the complainant and said Isaac, is affected by that knowledge. His deed should be set aside, or he compelled to join with said Isaac in the specific performance of said contract between the complainant and Closson. (2 *Story's Eq. Juris.* 103, § 748; *Taylor* v. *Stibbert,* 2 *Vesey, Jr.,* 438.)

☞ *J. A. Spencer* in reply—examines the evidence, &c.

*Cagger & Stevens, attorneys,* and
*Samuel Stevens, counsel,* for respondents.

*First.* The remedy by specific performance, is not a right to which the party is entitled *exdebito justicia.* It is an appeal to the extraordinary jurisdiction of the court, and therefore rests entirely in its discretion, upon a view of all the circumstances in each particular case. (2 *Story's Eq.,* § 742; *St. John* v. *Benedict,* 6 *J. C. R.* 117; *Seymour* v. *Delancy, id.* 224–228; *S. C. in error,* 3 *Cow.* 445.)

*Second.* ˙ If the contract have been obtained by fraud, deceit, or misrepresentation, not amounting to fraud, or by surprise, or any other unfair or inequitable practice, a specific performance will not be decreed, but the complainant will be left to such remedy as he can obtain at law. (2 *Story's Eq.* §§ 750, 751–769; 6 *J. C. R.* 225–6; 3 *Cowen,* 505–518, 521–526; 1 *Madd. Ch. Prac.* 321, *Am. ed.,* 1817; *do.* 404–5, *ed.* 1827.)

*Third.* The agreement in question was obtained with a knowledge and in violation of a previous parol agreement or understanding between Closson and Mosher, that Mosher was to have the farm, he having advanced to Closson a considerable portion of the purchase money, and had transmitted a deed to Closson to be executed by him for his part of the farm; and this was effected by playing upon a mind enfeebled and rendered irritable by gross habits of intoxication, by falsely alleging that Mosher did not want the farm, and that he was permitting it to get into a dilapidated state, so that he could obtain it for a trifling consideration. (*Pp.* 40–43; *corroborated pp.* 48–9.)

*Fourth.* The contract was agreed to be abandoned by the agent of the complainant, and all objections to the conveyance of the farm by Closson to Mosher were abandoned in July, 1833, a short time before the conveyance to Mosher. (*P.* 26.)

A parol discharge of a contract is a good defence to a bill for specific performance. (2 *Story's Eq.* § 770.)

*Fifth.* Mosher had the prior equitable right to the conveyance, and that right having been consummated by his subsequent acquisition of the legal title, he is, in justice and equity, as well as in law, entitled to retain it.

*Sixth.* For these reasons, the decree of the vice-chancellor and chancellor should be affirmed.

DECISION—*Decree affirmed. For affirmance*—JEWETT, Ch. J.; GARDINER, JONES, WRIGHT and GRAY, JJ. *For reversal*—BRONSON, RUGGLES, and JOHNSON, JJ.

NOTE.—The opinion of the vice-chancellor, WILLARD, is the only one which discusses the merits of this case. And he *held,* that the party who seeks the

aid of a court of equity, in enforcing a specific performance of a contract, holds the affirmative, and must make out a case entitling him to the relief sought. And must show, 1st. That the legal remedy is inadequate; and that, without a specific performance, injustice will be done, or irreparable injury produced. And, 2d. That the contract is fair, just, and reasonable, equal in all its parts, founded on an adequate consideration, and free from fraud, misrepresentation, or surprise.

*Held*, that in this case, the proof showed—allowing, on the score of credibility, Fish to be preferred to Wm. B. Slocum—that it was probable that Wm. B. Slocum induced Closson to believe that Mosher did not want the place; that he had treated him unfairly, by letting it go to ruin with a view to get it for nothing; that Mosher wanted to cheat Closson out of the place; and that he then excited a hostile spirit in the bosom of Closson towards Mosher. That these assertions had a controlling influence on the mind of Closson, and induced him to make the contract with plaintiff. That they were alleged to be false, and no attempt had been made to show that they were true.

The complainant, in fact, had no equity against either defendant.

*Not reported.*